**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **JULIAN J. BROWN,** | * |
|     **Plaintiff,** | * |
|     **v.** | * |
| **WEXFORD HEALTH SOURCES, INC.,** *et al.* | *   **CIVIL NO. JKB-17-1212** |
|     **Defendants.** | * |

\* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM**

Plaintiff Julian J. Brown sued Defendants Wexford Health Sources, Inc. ("Wexford"), Dolph Druckman, M.D., Contah Nimely, M.D., and Lori Slavick, P.A. pursuant to 42 U.S.C. § 1983, alleging that Defendants violated his Eighth Amendment rights by failing to provide him adequate medical care during his incarceration at the Maryland Correctional Institution-Hagerstown ("MCIH") and the Maryland Correctional Training Center ("MCTC"). Following the close of discovery, Defendants moved for discovery sanctions (ECF No. 50), then moved for summary judgment (ECF No. 52). Brown did not oppose the motion for sanctions. He did oppose the motion for summary judgment (ECF No. 55), and that motion is fully briefed. No hearing is required on either motion. *See* Local Rule 105.6 (D. Md. 2018). For the reasons set forth below, Defendants' motion for sanctions will be granted, though the requested sanction of dismissal will be denied. Defendants' motion for summary judgment will be granted in its entirety as to Wexford and Dr. Druckman. The motion will also be granted in part as to Dr. Nimley and PA Slavick, but denied with regards to: (1) those Defendants' failure to provide Brown with physical therapy, and (2) PA Slavick's decision to withhold Brown's premeal insulin on June 16, 2015.

### I.     *Factual and Procedural Background*

The procedural history and facts are set forth in the Court's prior Memorandum Opinion (ECF. No. 27) and are incorporated by reference and repeated as necessary to provide context and to resolve the pending motions.  While incarcerated, Brown brought this lawsuit *pro se* to challenge the medical care he received at MCIH and MCTC.  Brown has long been an unhealthy man, and at the time of his incarceration, he suffered from: (1) Type 1 diabetes, which Brown and his doctors had long struggled to control and which had already caused Brown to lose the use of his left eye and a kidney (Fowlkes Report at 2–3, Mot. Summ. J. Ex. 2, ECF No. 52-3); (2) serious weakness in his left leg as a result of a violent assault Brown suffered in 2014 (Med. Records at Def000029–35, Mot. Summ. J. Ex. 4, ECF No. 52-5); and (3) a number of other significant medical conditions, including hyperlipidemia, Hepatitis C, and hypertension (*id.* at Def000913).

In his verified Complaint and Amended Complaint, Brown alleged five discrete acts on the part of the Defendants that he claims constituted deliberate indifference to his serious medical needs.  (*See* Compl., ECF No. 1; Am. Compl., ECF No. 4.)  First, Brown alleged that following his discharge from the Metropolitan Transition Center ("MTC") infirmary on June 15, 2015 and subsequent transfer to MCIH and MCTC, Dr. Nimley and PA Slavick violated his Eighth Amendment rights by altering his diabetes treatment plan in a manner which Brown contends led him to suffer a series of hypoglycemic and hyperglycemic episodes and associated complications. (Am. Compl. ¶¶ 13–14.)  Second, Brown alleged that Dr. Nimley and PA Slavick violated his Eighth Amendment rights by failing to provide him with manifestly necessary physical therapy for his weakened left leg, in contravention of the discharge instructions received from Brown's provider at MTC.  (*Id.*)  Third, Brown alleged that in July of 2016, following his hospitalization at the University of Maryland Medical Center ("UMMC") in relation to a toe amputation procedure,

Dr. Druckman violated Brown's Eighth Amendment rights by failing to follow discharge instructions received from UMMC. (*Id.* ¶ 15.) Fourth, Brown alleged that on August 11, 2016, Dr. Druckman violated his Eighth Amendment rights when, rather than sending Brown to UMMC to have a subclavian Hickman catheter surgically removed, Dr. Druckman instead attempted to remove the catheter himself before sending Brown to have the catheter removed by a surgeon at Meritus Medical Center. (*Id.*) Fifth, Brown alleged that unspecified Wexford employees violated his Eighth Amendment rights when they failed to refill his prescription for azathioprine for several days, causing a brief gap in his use of the drug. (*Id.* ¶ 18.) Brown also alleged that Wexford was liable for each of its employees' illicit actions. (*Id.*)[1]

On February 5, 2018, Defendants filed a motion for dismissal or, in the alternative, for summary judgment. (ECF No. 23.) Defendants supported their motion with an affidavit from Dr. Druckman and a selection of Brown's medical records. Brown, who had recently been released from confinement but was still proceeding *pro se*, opposed the motion relying on the sworn statements in his verified Complaint and the documents attached thereto. (ECF No. 25.) The Court denied the motion, finding unexplored factual issues precluded judgment pre-discovery. (ECF No. 27.)

The Court then issued a scheduling order and discovery commenced. (ECF No. 36.) At the outset of discovery, Defendants propounded written discovery requests including interrogatories, requests for production, and requests for admissions. (*See* Mot. Sanctions Mem. at 2, ECF No. 50-2.) Brown twice sought and received from the Court amendments to the scheduling order to provide him extra time to respond to these written discovery requests. (ECF Nos. 45, 47.) But Brown never responded to Defendants' discovery demands—even after

---

[1] Brown also alleged violations on the part of Correct RX Pharmacy Services and correctional officials. His claims against those defendants were dismissed. (Mem. Op., ECF No. 27.)

retaining counsel and propounding his own written discovery requests. (Mot. Sanctions Mem. at 2–5.) Brown did, however, sit for a deposition. (*Id.* at 5.) Fact discovery ended on October 18, 2019 and expert discovery followed. Defendants submitted the reports of two medical experts. Brown did not submit any expert evidence, nor does he appear to have deposed Defendants' experts, leaving their testimony effectively uncontested.

On January 7, 2020, Defendants moved for discovery sanctions, seeking the dismissal of this case. (Mot. Sanctions, ECF No. 50.) Brown did not oppose the motion. Subsequently, on February 14, 2020, Defendants moved for summary judgment. (Mot. Summ. J., ECF No. 52.) Defendants supported their motion with medical records, excerpts from Brown's deposition, and two expert reports. Brown opposed the motion, again relying on the sworn statements in his verified Complaint and the records attached thereto. (Opp'n Mot., ECF No. 55.) The Court will address the pending motions in turn.

## II. *Motion for Sanctions*

Starting with the motion for sanctions, Defendants are certainly entitled to some sanction against Brown for his discovery violations, but dismissal would be too extreme. Instead, the Court will prohibit Brown from introducing evidence that Defendants sought in discovery and Brown withheld.

Federal Rule of Civil Procedure 37(d) establishes the Court's authority to grant sanctions against a party that fails to serve answers, objections, or a written response to properly served discovery requests. Rule 37(d)(3) provides that the Court "must require the party failing to act, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an

award of expenses unjust." Additionally, Rule 37(d)(3) empowers the Court to impose any of the sanctions available under Rule 37(b)(2)(A)(i)–(vi). These include:

> (i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;
> (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;
> (iii) striking pleadings in whole or in part;
> (iv) staying further proceedings until the order is obeyed;
> (v) dismissing the action or proceeding in whole or in part;
> (vi) rendering a default judgment against the disobedient party[.]

The Fourth Circuit has explained that a district court deciding what sanction to impose should consider four factors: "(1) whether the non-complying party acted in bad faith, (2) the amount of prejudice that noncompliance caused the adversary, (3) the need for deterrence of the particular sort of non-compliance, and (4) whether less drastic sanctions would have been effective." *S. States Rack & Fixture, Inc. v. Sherwin-Williams, Co.*, 318 F.3d 592, 597 (4th Cir. 2003) (quotations and citations omitted). A court should only grant dismissal in "the most flagrant case[s], where the party's noncompliance represents bad faith and callous disregard for the authority of the district court and the Rules." *Mutual Fed. Savings & Loan Ass'n v. Richards & Associates, Inc.*, 872 F.2d 88, 92 (4th Cir. 1989). Furthermore, because dismissal is such an extreme sanction, the Fourth Circuit has held that generally, "before dismissing a case with prejudice, the district court must give the noncomplying party a 'explicit and clear' warning." *Malhotra v. KCI Techs., Inc.*, 240 F. App'x 588, 590 (4th Cir. 2007) (citations omitted); *see also Franklin v. Tri-County Council for the Lower Eastern Shore of Maryland,* Civ. No. ELH-15-786, 2016 WL 3653966, at *4 (D. Md. July 8, 2016) (explaining "courts in the Fourth Circuit generally impose a dispositive sanction only in cases where the noncompliant party disregarded an earlier, lighter sanction, such as a protective order, a motion to compel, or the payment of attorney's fees").

In accordance with this precedent, the Court finds that dismissal would be inappropriate, but that fairness requires that Brown be precluded from introducing evidence sought by Defendants. The first three of the four factors identified by the Fourth Circuit all militate in favor of a strong sanction. First, Brown and his attorney have failed to provide any good faith explanation for Brown's misconduct, and the record leaves the Court no choice but to surmise bad faith. Second, if Brown is allowed to introduce at trial evidence he has thus far withheld, it would undoubtedly be highly prejudicial to Defendants. *See Johnson v. Diversified Consultants, Inc.*, Civ. No. PWG-15-1486, 2016 WL 1464549, at *3 (D. Md. Apr. 13, 2016) (finding "significant prejudice" because the plaintiff's failure to respond to discovery requests effectively "preclud[ed]" the defendant "from preparing a defense"). Third, there is an obvious need to deter this sort of extreme discovery misconduct.

However, the circumstances still weigh against dismissal. To start, the Court has not previously issued an explicit and clear warning that Brown's discovery violations could lead to dismissal. Neither has the Court imposed a lighter sanction which Brown ignored. Additionally, while Brown ignored Defendants' written discovery requests, he did sit for a deposition, thereby affording Defendants some opportunity for discovery.

Therefore, instead of dismissing, the Court will preclude Brown from introducing evidence sought by Defendants in their written discovery requests, pursuant to Rule 37(b)(2)(A)(ii). This less drastic sanction will essentially remedy the harm to Defendants. In terms of documentary evidence, Brown will be limited to introducing documents attached to his Complaint or produced by Defendants. Additionally, having failed to respond to Defendants' interrogatories, Brown will be prevented from introducing any evidence sought by those interrogatories or relying on the testimony of witnesses whose identities Brown withheld. Further, since Brown failed to respond

to Defendants' Requests for Admissions, he will be deemed to have made the admissions sought by Defendants—to the extent he has not otherwise provided a sworn denial and consistent with the Fourth Circuit's "strong policy that cases be decided on their merits." *United States v. Shaffer Equipment Co.*, 11 F.3d 450, 453 (4th Cir. 1993).

Regarding expenses, the Court finds that it would be unjust to impose an award of expenses against Brown under the circumstances. The Court recognizes that there is no "flat per se policy" against imposing expenses on "any party who is financially indigent." *Bosworth v. Record Data of Maryland, Inc.*, 102 F.R.D. 518, 521 (D. Md. 1984). However, given Brown's recent incarceration, his severe and well documented medical issues, and the current public health crisis, the Court finds that exceptional circumstances render expenses inappropriate in this instance.

### III.    Motion for Summary Judgment

#### A.  Legal Standards

Turning to the summary judgment motion, Federal Rule of Civil Procedure 56(a) establishes that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Court must "view the evidence in the light most favorable to[] the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 645 (4th Cir. 2002). However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247–48 (1986) (emphasis in original). Therefore "[a] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleadings,' but rather must 'set

forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)).  A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 249–50.

To prove an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the defendant's actions or failure to act amounted to deliberate indifference to a serious medical need.  *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  This requires proof of both an objective and a subjective element.  *See Farmer v. Brennan*, 511 U.S. 825 (1994).  Objectively, a plaintiff must show that he had a "serious" medical need—meaning a medical need "that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)).  The plaintiff must also show that the challenged conduct caused "a serious or significant physical or emotional injury" or "a substantial risk of such serious harm." *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (quoting *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003)).

To prove the subjective component of deliberate indifference, a plaintiff must show "subjective recklessness" in the face of the serious medical condition.  *See Farmer*, 511 U.S. at 839–40.  "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997).  "[I]t is not enough that an official should have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) (citations omitted).  If the requisite subjective knowledge is established, an official may avoid

liability "if [he or she] responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer,* 511 U.S. at 844. Thus, "[d]eliberate indifference is more than mere negligence, but less than acts or omissions done for the very purpose of causing harm or with knowledge that harm will result." *Scinto*, 841 F.3d at 225 (internal quotations and citations omitted).

### B. Claims Against Wexford

Starting with Brown's claims against Wexford, Wexford is entitled to summary judgment because Brown has failed to provide any evidence that a Wexford policy or custom contributed to any of his alleged injuries. Under *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658 (1978), to prove a 42 U.S.C. § 1983 claim against an entity acting under color of state law, a plaintiff must show not only that an agent of the entity violated his rights, but also that the entity's policies or customs caused the violations. *See also Powell v. Shopco Laurel Co.,* 678 F.2d 504 (4th Cir. 1983) (applying *Monell* to private entities acting under color of state law). A culpable policy, practice, or custom can arise in four ways:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that 'manifest[s] deliberate indifference to the rights of citizens'; or (4) through a practice that is so 'persistent and widespread' as to constitute a 'custom or usage with the force of law.'

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (alterations in original) (quoting *Carter v. Morris*, 164 F.3d 215, 217 (4th Cir. 1999)).

Undisputedly, Wexford provided medical services to Maryland inmates under color of state law. *See Burns v. Ashraf*, Civ. No. JKB-18-03100, 2019 WL 4169838, at *8 (D. Md. Sept. 3, 2019). Brown has produced no evidence that any Wexford policies, practices, or customs contributed to any of his alleged harms. Further, Brown has effectively waived the opportunity to present such evidence by failing to respond to Wexford's interrogatories on the subject. (*See*

9

Wexford Interrogatory Nos. 2-6, Mot. Sanctions Ex. 1, ECF No. 50-3.) The Court initially denied pre-discovery judgment on this issue in light of Brown's *pro se* status, the limited record before the Court at that time, and the possibility that Brown would be able to expand upon his claims against Wexford through discovery. *C.f. Brown v. N.C. Dep't of Corrs.*, 612 F.3d 720, 722 (4th Cir. 2010) (noting that *pro se* inmates' complaints are entitled to particularly liberal construction). But based on the record since produced, no reasonable jury could find Wexford liable.

### C. *Claims Against Dr. Druckman*

Dr. Druckman is also entitled to summary judgment. Brown challenges two actions on Dr. Druckman's part: (1) Dr. Druckman's decision to deviate from the UMMC discharge instructions regarding monitoring and follow-up appointments after Brown's return to Wexford's care in July of 2016, and (2) Dr. Druckman's decision to attempt to remove Brown's Hickman catheter before sending Brown to Meritus Medical Center for removal by a surgeon, rather than sending Brown to UMMC for surgical removal in the first instance. Regarding the first allegation, Brown claims that upon his return from UMMC, Dr. Druckman did not schedule certain specialist appointments suggested by UMMC or follow the monitoring regime specified in the discharge instructions. (Compl. ¶ 16; Opp'n Mot. at 5.) Brown does not claim that these divergences resulted in any particular injury, but instead implies that the mere fact that the "discharge orders were not followed" suffices to support a finding of deliberate indifference. (Opp'n Mot. at 5.)[2] In response, Dr. Druckman has testified that it is typical for a treating physician to deviate from hospital discharge instructions regarding follow-up appointments and monitoring schedules, and that his actions fell within the standard of care. (Druckman Aff. ¶ 11, Mot. Dismiss Ex. 6, ECF No. 23-

---

[2] In the Complaint, Brown also claimed that Dr. Druckman did not follow UMMC's instructions regarding the provision of certain medications. (Compl. ¶ 16.) Dr. Druckman denied that assertion (Druckman Aff. ¶ 11), which is unsupported by the medical records, and Brown's summary judgment briefing does not contest the issue (Opp'n Mot. at 5).

9.) Importantly, Defendants have also provided expert testimony from a non-party physician affirming that Dr. Druckman's conduct met the standard of care, and Brown has provided no countervailing medical evidence. (*See* Fowlkes Report at 9.) Because Brown has provided neither evidence that Dr. Druckman's modifications caused any harm nor evidence contradicting the expert testimony that Dr. Druckman's modifications were appropriate and safe, summary judgment will be granted to Dr. Druckman.

The same analysis holds with regards to Dr. Druckman's attempted removal of Brown's Hickman catheter in August of 2016. Brown points out that the UMMC discharge instructions called for the catheter to be removed by UMMC interventional radiology and that by first attempting to remove the catheter himself, then sending Brown to Meritus Medical Center for removal, Dr. Druckman diverged from these instructions. (Compl. ¶ 16; Opp'n Mot. at 5.) Brown characterizes Dr. Druckman's attempt to non-surgically remove the catheter as "torture." (Compl. ¶ 16.) In response, Dr. Druckman has testified that "[r]emoving a Hickman catheter is often a nursing activity and being removed by a physician is certainly within the standard of care." (Druckman Aff. ¶ 5.) Importantly, Defendants have also introduced uncontradicted expert testimony from two non-party physicians explaining that it is standard for a treatment provider to diverge from hospital discharge instructions in this manner and that it was appropriate for Dr. Druckman to first attempt to remove the catheter himself before sending Brown to Meritus Medical Center. (Fowlkes Report at 8–9; Mengel Report at 3, Mot. Summ. J. Ex. 3, ECF No. 52-4.) Further, Defendants have introduced medical records reflecting that upon his arrival at Meritus Medical Center hours after Dr. Druckman's attempted removal, Brown "denie[d] any fever or pain

or issues with the catheter" and merely stated that the catheter was "a little tender if you pull on it." (Med. Records at Def002815–16.)[3]

Again, Brown's decision to rest on the assertions in his verified Complaint and his failure to introduce any additional evidence in support of his claim are dispositive. All the evidence now in the record indicates that it was reasonable for Dr. Druckman to attempt to remove the Hickman catheter. The discharge instructions Brown attached to his Complaint, standing on their own and without any contextualizing testimony, cannot raise a material issue of fact in the face of Defendants' medical experts' clarifying testimony. Further, the evidence does not support Brown's characterization of Dr. Druckman's attempt at removing the catheter as "torture" in violation of the Eighth Amendment, and instead indicates that immediately following Dr. Druckman's attempt, the area around the catheter was uninjured and merely "a little tender" if manipulated. (Med. Records at Def002815–16.) *C.f. Smith v. Ozmint*, 578 F.3d 246, 254 (4th Cir. 2009) (explaining a court should not accept characterizations that are "blatantly contradicted by the record") (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)); *Snipes v. DeTella*, 95 F.3d 586, 591–92 (7th Cir. 1996) (granting summary judgment on claim related to painful medical procedure because it was not "the type of barbaric treatment the Eighth Amendment was intended to prevent").[4] While prior to discovery, judgment on this issue would have been inappropriate given the lack of expert testimony and the possibility that Brown would be able to marshal evidence refuting Dr. Druckman's contentions, Brown has failed to do so. In light of the overwhelming evidence that though the attempt was ineffectual and unpleasant, it was appropriate and did not cause Brown serious pain or physical injury, no reasonable jury could find Dr. Druckman liable.

---

[3] Brown has effectively admitted the veracity of these records by failing to respond Wexford Interrogatory No. 1.
[4] Brown's descriptions of this procedure in his filings with the Court have also been inconsistent. In the verified Complaint, Brown averred Dr. Druckman's attempt lasted "abou[t] half an hour." (Compl. ¶ 16.) In the unverified Amended Complaint, the procedure doubled in duration to "about an hour." (Am. Compl. ¶ 15.)

### *D. Claims Against Dr. Nimley and PA Slavick Regarding Diabetes Treatment*

Dr. Nimley and PA Slavick are also entitled to summary judgment with regards to most of Brown's allegations related to their treatment of his diabetes. However, a material issue of fact prevents summary judgment specifically regarding PA Slavick's decision to withhold Brown's premeal insulin upon his arrival at MCIH on June 16, 2015.

Brown claims that Defendants made a series of changes to his diabetes treatment regimen that resulted in his diabetes spiraling out of control. (Compl. ¶¶ 14–15; Opp'n Mot. at 3–5.) Brown challenges PA Slavick's decision to withhold his premeal insulin on the night of his arrival to MCIH prior to examining Brown. He also takes issue with a number of Defendants' subsequent treatment decisions, including PA Slavick's June 22, 2015 decision to add a "25 unit Levemir pm dose to his treatment plan" and Dr. Nimley's alleged July 20, 2015 decision to reduce his premeal insulin dose by forty percent and discontinue his sliding scale adjustments.[5] (Compl. ¶¶ 14–15.) Brown has not provided any medical expert testimony in support of his claims that these adjustments were reckless and caused him harm, but argues that "[e]xpert testimony is not necessary for the trier of fact to understand that a successful course of insulin therapy was changed resulting in multiple hypoglycemic episodes and infirmary admission." (Opp'n Mot. at 4.)

Defendants have introduced copious medical records reflecting that Defendants and their Wexford colleagues were attentive to Brown's condition and made regular adjustments designed to bring Brown's diabetes under control. (*See, e.g.*, Med. Records at Def000915–1036.) These records also reflect that Brown often ignored his providers' instructions regarding his diet, and that his providers believed this non-compliance to be the cause of Brown's complications. (*See, e.g.*, Med. Records at Def000947–48, Def000993–94, Def001032–36.) Additionally, Defendants have

---

[5] This latter allegation is not supported by the medical records that Brown and Defendants have introduced. (*See* Med. Records at Def000967–85).

introduced the opinions of two medical experts, both of whom find that Defendants' decisions were reasonable and appropriate attempts to treat Brown's diabetes, which has been uncontrolled for much of his life. (Fowlkes Report at 12; Mengel Report at 6.)

Again, Brown's failure to present medical expert testimony enabling a jury to make sense of the medical decisions he challenges mandates summary judgment in relation to his providers' adjustments to his insulin regimen. Brown's allegations raise questions that cannot be resolved in his favor; given the unanimous medical testimony to the contrary, a lay jury is in no position to determine on Brown's say-so alone that PA Slavick's decision to add an evening dose of Levemir was medically contraindicated, much less that it was subjectively reckless. The same goes for her and Dr. Nimley's other adjustments. Even if, in retrospect, some of these changes may have been ill advised, Brown has provided the jury no basis upon which to find they were not medically reasonable. *C.f. Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (explaining that generally, "[d]isagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim"); *Jackson,* 775 F.3d at 178 (granting summary judgment to doctor who was not reckless even though "hindsight suggests that [his] treatment decisions may have been mistaken, even gravely so").

However, summary judgment will be denied specifically with regards to PA Slavick's decision to withhold Brown's premeal insulin on June 16, 2015. The Fourth Circuit's decision in *Scinto v. Stansberry*, 841 F.3d 219 (4th Cir. 2016), is on point and precludes summary judgment with respect to this particular act. In *Scinto*, the Fourth Circuit held that summary judgment could not be granted to a doctor who, without medical justification, withheld an insulin dose that he had previously deemed medically necessary. The Fourth Circuit explained that although the diabetic plaintiff had failed to provide expert testimony, summary judgment was unmerited since a lay jury

"is capable of understanding, unaided, the risks of failing to provide insulin to a diabetic and of a trained doctor's denial of a diabetic's known need for insulin." *Id.* at 230 (citing *Lolli v. City of Orange*, 351 F.3d 410, 419–20 (9th Cir. 2003); *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 582–83 (3d Cir. 2003)).

Here as in *Scinto*, PA Slavick withheld prescribed insulin without a clear treatment-related justification. Though Defendants claim that PA Slavick did so "for the purpose of obtaining a baseline blood glucose level" (Reply Mem. Supp. Summ. J. at 2, ECF No. 56), they have provided no testimony from PA Slavick explaining why she deemed it safe to withhold this insulin given Brown's condition, nor any expert testimony specifically addressing the propriety of withholding a prescribed insulin dose from an individual with brittle diabetes prior to examining him. Given this evidentiary record and the Fourth Circuit's holding in *Scinto*, the Court cannot decide as a matter of law that PA Slavick's decision did not recklessly risk substantial harm to Brown. However, at trial, Brown will be limited to challenging this one aspect of his diabetes treatment and seeking damages for harm caused by this single withholding. He will not be able to challenge subsequent alterations to his insulin regimen or seek damages for associated harms, nor testify regarding as-yet unrevealed medical complications.

### E. Claims Against Dr. Nimley and PA Slavick Regarding Physical Therapy

Material issues of fact also preclude summary judgment on Brown's claim that Dr. Nimley and PA Slavick committed deliberate indifference by failing to provide him with physical therapy. Brown argues that his leg weakness manifestly required treatment and points to the discharge instructions provided by his MTC physician for support. Brown also claims that Dr. Nimley refused his request for physical therapy and told him that "physical therapy is a waste of money." (Compl. ¶ 15.) In Defendants' first dispositive motion, they argued that physical therapy was not

actually medically indicated and provided supporting testimony to that effect from Dr. Druckman. (Druckman Aff. ¶ 6.) However, in their motion for summary judgment, Defendants have now admitted that Dr. Nimley and another Wexford provider determined that physical therapy was medically indicated and requested authorization to provide it. (Mot. Summ. J. Mem. at 7–8, 17–18; Med. Records at Def002587–89.) Defendants state that the therapy was cancelled because "Brown's repeated infirmary admissions related to his uncontrolled diabetes took precedence." (Mem. Supp. Summ. J. at 8.) But they introduce no testimony supporting this narrative, and the single document they provide is less than clear. (Med. Records at Def004008–10.)

The record leaves it uncertain whether Dr. Nimley's and PA Slavick's failure to provide Brown with physical therapy constituted deliberate indifference. It is now undisputed that physical therapy was objectively medically indicated, and that Dr. Nimley herself recognized Brown's need for such therapy. *See Jackson,* 775 F.3d at 179 ("'[F]ailure to provide the level of care that a treating physician [herself] believes is necessary' may constitute deliberate indifference.") (quoting *Miltier v. Beorn*, 896 F.2d 848, 853 (4th Cir.1990)). Though Defendants claim that their failure to provide the physical therapy was medically justified, the record is not at all clear why providing treatment for Brown's diabetes prevented Defendants from also providing him with physical therapy. Indeed, the record indicates that physical therapy may actually have facilitated the treatment of his diabetes, since Brown's leg weakness made it difficult for him to go to the medical dispensary and was reportedly a factor driving Brown's inconsistent adherence to his diabetic diet. (*See, e.g.*, Med. Records at Def000947–48.) Further, though Brown has admitted that he was capable of engaging in certain basic tasks in spite of his injury (Requests for Admissions Nos. 8–12, ECF No. 52-7) and that his leg weakness resolved by "sometime [in] 2016" (Brown Dep at 126:3–127:7), it is not clear that the harm he suffered from having his partially

debilitating injury go untreated is insufficiently serious to justify a finding of deliberate indifference. In sum, there are material issues of fact regarding this claim which cannot be resolved on summary judgment. However, Brown will again be limited to testifying regarding facts he has already disclosed and presenting evidence already produced.

### IV.     *Conclusion*

For the foregoing reasons, an order shall enter granting Defendants' motion for discovery sanctions, and granting in part and denying in part Defendants' motion for summary judgment.

DATED this 27th day of April, 2020.

BY THE COURT:

/s/
James K. Bredar
Chief Judge